[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12245

_____

U.S. Tax No. 10154-99

ROBERT L. ROSE,
ALICE N. ROSE,

                                        Petitioners-Appellants,

                        versus

COMMISSIONER OF INTERNAL REVENUE SERVICE,

                                        Respondent-Appellee.

_____

No. 07-12246

_____

U.S. Tax No. 5836-99

PK VENTURES, INC. AND SUBSIDIARIES,

                                        Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petitions for Review of a Decision of the
United States Tax Court

_____

**(April 24, 2008)**

Before HULL and PRYOR, Circuit Judges, and MOORE,[*] District Judge.

PER CURIAM:

In these consolidated cases, petitioners-appellants Robert and Alice Rose

("Rose"),[1] and petitioner-appellant P.K. Ventures, Inc. and its subsidiaries

("PKV"), seek review of a decision of the United States Tax Court. The Tax Court

determined that Rose owed $1,078,212 in tax deficiencies and $86,427 in tax

penalties, and further determined that PKV owed $1,143,394 in tax deficiencies.

After review and oral argument, we affirm in part and reverse in part.

## I. BACKGROUND

**A.     Facts**

---

[*]Honorable K. Michael Moore, U.S. District Judge for the Southern District of Florida, sitting by designation.

[1]The Roses are both petitioners in this tax case because they filed joint tax returns; however, all relevant behavior was undertaken by Robert Rose. Accordingly, we refer only to "Rose" unless otherwise noted.

2

Rose, a highly-educated corporate financier, began working for a company called Printon Kane & Co. ("Printon Kane") in 1985. Printon Kane was in the business of dealing in bonds and other investment opportunities. Rose worked in corporate finance for Printon Kane, acting as a loan broker and working to find lenders to fund small hydroelectric, cogeneration, and coal mining projects.

In 1986, Rose organized PKV as a subchapter C corporation, as part of his duties to develop investment opportunities for Printon Kane. PKV was formed to own and operate pipelines and alternate energy facilities. Rose and PKV agreed that Rose would receive an equity interest in PKV, as part of his Printon Kane compensation, for arranging the PKV investment opportunity, and Rose was responsible for PKV's day-to-day operations at all times pertinent.[2]

Rose acquired a 40% interest in PKV in 1987, and his percentage interest increased to approximately 85% in 1990 when PKV redeemed other shareholders' stock. PKV's "fair market value" was approximately $500 on December 31, 1986. However, by December 31, 1993, PKV's "fair market value" was approximately $15 million.

In 1986, Rose, as the sole director of PKV and as part of his duties for Printon Kane, formed a company called "PKV I LP" ("PKVI"). PKVI was formed

---

[2]Rose was the initial sole director of PKV, and, with a temporary break in service, was also PKV's president, treasurer, and secretary. Rose handled cash management, payroll, insurance, risk management, customer service, and marketing for PKV.

to own and operate hydroelectric, cogeneration, and other energy projects. Rose was initially given an 30% general partnership interest in PKVI, and by 1989, Rose held a 70% interest in PKVI. At the end of each of the years 1986-1993, PKVI owed millions of dollars in nonrecourse debts to various unrelated parties.[3]

Also in 1986, PKV acquired all of the stock of St. Louis Pipeline Co. ("SLPC"), Tampa Bay Pipeline Co. ("TBPC"), Tampa Pipeline Co. ("TPC"), and Tampa Pipeline Transport Co. ("TPTC"). PKV became the holding company for those companies and began filing consolidated income tax returns in 1987. Rose ran PKV and its subsidiaries from the point of this acquisition forward.

In 1987, PKV purchased all of the stock of Zephyr Rock & Lime Co. ("Zephyr"), a Florida subchapter S corporation that mined and processed limestone from a Florida quarry. Rose owned a 40% share in Zephyr. In 1987 and 1988, Printon Kane, PKV, TBPC, and TPTC collectively transferred approximately $2.2 million to Zephyr to fund its operations, but Zephyr did not do well. From 1987-1989, Zephyr allocated a total of approximately $1.5 million in losses to Rose, which losses Rose carried forward and deducted on his 1990-1992 tax returns. Zephyr filed for bankruptcy in 1988, relieving itself of over $7 million in debt, and

---

[3]"Nonrecourse debt is 'debt secured by the property that it is used to purchase. The purchaser of the property is not personally liable for the debt on default. Rather, the creditor's recourse is to repossess the related property.'" Western Group Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1356 n.2 (11th Cir. 1999) (citation and brackets omitted). PKVI's nonrecourse debts were secured by its hydroelectric properties.

4

in early 1990, a third party purchased Zephyr's assets.

PKV struggled financially from its inception through 1991. In 1990, Rose wrote off as uncollectible a loan of $400,000 that he had previously made to PKV, and Rose testified that PKV was nearly insolvent as of the end of 1991. Between 1986-1991, PKV and its subsidiaries deducted a total of approximately $740,000 in compensation to Rose (an average of approximately $123,000 per year). Additionally, between 1986-1990, Rose was paid a total of approximately $250,000 by Printon Kane.

In 1992, however, PKV's fortunes improved. For the 1992 and 1993 taxable years, PKV claimed deductions for compensation paid to Rose of $1,646,948 (1992) and $2,031,993 (1993). PKV and Rose claim that "[m]uch of these amounts were intended to compensate Rose for services rendered to PKV during 1986 through 1991 for which he [Rose] had not been sufficiently compensated." Rose alone decided the amount of compensation he would receive in 1992 and 1993, and in March 1992, he made entries to PKV's general ledger to reflect "deferred compensation" payable to him for 1986-1991, as follows:

| 1986 | $500,000 |
| 1987 | $600,000 |
| 1988 | $720,000 |
| 1989 | $840,000 |
| 1990 | $900,000 |
| 1991 | $900,000 |

5

It is undisputed that there were no written deferred compensation agreements between PKV and Rose.[4] Rose testified that in determining the above amounts of his "deferred compensation," he researched newspaper and magazine articles for information about what other corporations were paying their executives.

As of December 31, 1992, the "deferred compensation" account in PKV's general ledger showed a balance of $3,713,052. However, PKV reported no deferred compensation liability on its 1992 and 1993 tax returns.

In 1992, Rose loaned PKV $990,000 in cash, and in 1993, he loaned PKV $2,863,500 in cash. At the beginning of January 1994, PKV reorganized its corporate structure, resulting in two subchapter S corporations: SLPC and TPC. PKV, TPTC, and TBPC were merged into TPC. After the reorganization, Rose owned all of SLPC and a portion of TPC. SLPC had no gross receipts in 1991-1993, and in fact was insolvent in 1993. In 1994, SLPC incurred major losses. Meanwhile, TPC was profitable after the reorganization, generating taxable income of approximately $3.4 million in 1994 and $4.4 million in 1995.

SLPC owed TPC approximately $1.7 million as of January 1, 1994. On

---

[4]The notes to the audited financial statements for PKV, SLPC, TBPC, and TPTC for 1989 did explain, however, that each corporation's management had "extended payment terms related to certain accrued payables such as officer's salary, indefinitely, subject to cash availability."

December 31, 1994, Rose paid $350,000 of SLPC's debt to TPC by reducing the amount that TPC owed him by $350,000. Rose did the same thing in 1995, paying $800,000 of SLPC's debt to TPC by reducing the amount TPC owed him by $800,000. SLPC reported "loans from shareholder" of $350,000 at the end of 1994, and $1,219,000 at the end of 1995 (which included the $800,000 and $350,000 reductions in debt).

## B.  Procedural History

In December 1998, respondent-appellee, the Commissioner of Internal Revenue ("Commissioner"), issued a notice of deficiency to PKV for the 1990-1993 tax years, asserting total tax deficiencies of approximately $2.4 million.[5]  In March 1999, the Commissioner issued a notice of deficiency to Rose for the 1990-1995 tax years, asserting total tax deficiencies of approximately $1.4 million.[6] PKV filed a timely petition in the Tax Court in March 1999, and Rose filed a

---

[5]PKV's notice of deficiency stated that PKV had tax deficiencies of approximately $211,000 in 1990; $791,000 in 1991; $650,000 in 1992; and $750,000 in 1993.  The notice further stated that PKV owed penalties of approximately $2000, $9500, and $1300 for the 1990-1992 taxable years, respectively.

[6]Rose's notice of deficiency stated that Rose had tax deficiencies of approximately $12,000 in 1990; $90,000 in 1991; $503,000 in 1992; $177,000 in 1993; $248,000 in 1994; and $397,000 in 1995.  The notice further stated that Rose owed penalties of approximately $2300, $18,000, $100,000, and 35,000 for the 1990-1993 taxable years, respectively (for substantial understatement of taxes owed), and an additional penalty of approximately $8500 for 1995 (for failure to file a timely tax return).

7

timely petition in the Tax Court in June 1999. The Tax Court consolidated the cases.

After a trial, the Tax Court issued a memorandum opinion in March 2005. On May 27, 2005, PKV and Rose collectively moved for reconsideration. On July 1, 2005, PKV and Rose also moved for leave to amend their pleadings, in order to plead a statute of limitations defense.

About eight months later, on March 7, 2006, the Tax Court withdrew and vacated its March 2005 First Memorandum Opinion and substituted its Second Memorandum Opinion. See PK Ventures, Inc. v. Comm'r, 91 T.C.M. (CCH) 806 (2006). The Tax Court ultimately sustained $1,078,212 in tax deficiencies and $86,427 in penalties against Rose, sustained $1,143,394 in tax deficiencies against PKV. In a separate order also dated March 7, 2006, the Tax Court denied leave to amend the pleadings.

PKV and Rose each appeal the judgments, which were based on a large number of adjustments to their tax returns by the Tax Court. Only some of the Tax Court's adjustments and decisions are before this Court on appeal, however, because some of the Tax Court's determinations actually favored PKV and Rose. PKV and Rose also appeal the Tax Court's denial of their motion for leave to amend.

8

Specifically, PKV and Rose argue before this Court that the Tax Court: (1) erred in refusing to allow them to amend their pleadings and assert their statute of limitations defense;[7] (2) erred in refusing to adjust PKV's and Rose's tax bases in PKVI to reflect their shares of PKVI's partnership liabilities, and exceeded its jurisdiction by computing PKV's and Rose's bases in PKVI in a manner inconsistent with PKVI's tax returns; (3) exceeded its jurisdiction by calculating Rose's tax basis in Zephyr in a manner that was inconsistent with Zephyr's tax returns; (4) erred in refusing to allow Rose to increase his tax basis in SLPC by the $1,150,000 that Rose loaned to SLPC in 1994 and 1995 by substituting SLPC as a debtor for TPC; (5) erred in determining that Rose was sufficiently compensated by PKV between 1986-1991, and in refusing to permit PKV to deduct in 1992 and 1993 the amounts that it paid Rose during those years for services purportedly rendered by Rose in prior years; and (6) erred in imposing tax penalties against Rose.[8]

As to issue 5, we conclude that the Tax Court did not commit clear error in determining that Rose was sufficiently compensated for his 1986-1991 service, or

[7]We review the denial of a motion for leave to amend the pleadings for abuse of discretion.  See Butts v. County of Volusia, 222 F.3d 891, 892 n.2 (11th Cir. 2000).

[8]The Tax Court's findings of fact are reviewed for clear error, and its resolutions of questions of law, including whether it has subject matter jurisdiction, are reviewed de novo.  See Creel v. Comm'r, 419 F.3d 1135, 1139 (11th Cir. 2005); see also Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 408 (11th Cir. 1999).

in determining that PKV's deferred compensation deductions were unreasonable, and therefore we affirm as to that issue without additional discussion. However, we reverse and remand as to issues 1, 2, 3, 4, and 6 for the reasons outlined below.

## II. DISCUSSION

### A. Issue 1: Denial of Motion for Leave to Amend

Tax Court Rule 41 states that after a responsive pleading has been served, a party may "amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires." U.S. Tax Ct. R. 41(a). In addressing a similar provision in the Federal Rules of Civil Procedure, the United States Supreme Court has said:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); see also Young v. Comm'r, 926 F.2d 1083, 1087 (11th Cir. 1991) (applying Foman to a tax case in which Tax Court granted the government leave to amend its answers three days prior to trial).

According to PKV and Rose, the Tax Court abused its discretion in denying leave to amend because it failed to consider the factors discussed in Foman, including the undisputed validity of the statute of limitations defense, the taxpayers' legitimate reasons for their delay in raising the defense, and the lack of "undue prejudice" to the Commissioner if the defense is allowed. PKV and Rose emphasize that the Tax Court wholly failed to consider that their delay was caused in large part by an error by the Commissioner.

More specifically, PKV and Rose stress that all parties involved—Rose, PKV, the Commissioner, and even the Tax Court itself—were fooled by the Commissioner's notices of deficiency and the Commissioner's error in treating certain adjustments in those notices as though they were non-partnership or non-S corporation items and therefore not subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), including TEFRA's statute of limitations in 26 U.S.C. § 6229.[9] Indeed, the notices of deficiency specifically indicated that partnership items would be litigated in separate TEFRA proceedings, but—after the trial—it turned out that the notices themselves mistakenly contained

_____

[9]TEFRA created, inter alia, a new scheme for partnerships, pursuant to which partnership items would no longer be audited partner-by-partner. Rather, under TEFRA, all common partnership and subchapter S-level items are evaluated in one uniform proceeding to determine those items applicable to all partners. Thereafter, individual partner-level proceedings are held as to items unique to the partners. See Callaway v. Comm'r, 231 F.3d 106, 108-11 (2d Cir. 2000).

various partnership and S corporation adjustments that should have been made in separate TEFRA proceedings.

Rose and PKV emphasize that all parties, including the Commissioner and the Tax Court, first realized only after trial that partnership-level adjustments (and thus TEFRA) were implicated, and in fact, the Commissioner concedes that its own notices of deficiency erroneously made certain partnership-level adjustments and "did not properly treat all of the partnership and affected items" under TEFRA. Br. of Comm'r, at 30. Thus, Rose and PKV argue that the case was mistakenly litigated through trial by all parties as to certain partnership and TEFRA-affected items due to the Commissioner's own error in the deficiency notices. Notably, the Commissioner and the Tax Court both indicated at a September 2005 hearing that they both "missed" these "really hard [TEFRA] issues." In fact, once the mistake was discovered, the Tax Court had to withdraw and rewrite its First Memorandum Opinion, because it lacked jurisdiction to make certain of the adjustments to partnership and S corporation items that it had made in that first opinion (those adjustments having not been made in any separate partnership or S corporation-level proceeding).

Therefore, it was only after trial that the parties realized that several of the adjustments in the notices of deficiency involved "partnership," "subchapter S," and other "affected" items within the meaning of TEFRA, and because of that, only

12

then that PKV and Rose first raised the argument that TEFRA's statute of limitations might bar the Commissioner from assessing tax attributable to their interests in Zephyr and PKVI. See 26 U.S.C. § 6231(a)(3), (5) (defining "partnership" and "affected" items); Treas. Reg. 301.6245-1T (defining "subchapter S" items). As the taxpayers point out, there is a separate, specific limitations period for assessing tax attributable to partnership, S corporation, or TEFRA-affected items, which is, generally, three years from the filing date of the relevant tax returns. See 26 U.S.C. §§ 6501(a) & 6229(a). The Commissioner and a taxpayer may extend this three-year time period, but any such agreement must contain an express extension for partnership, S corporation, or TEFRA-affected items. 26 U.S.C. § 6229(b)(3). Although the Commissioner and the taxpayers in this case entered into certain Form 872 agreements that extended the time that the Internal Revenue Service ("IRS") had to assess tax, their Form 872 agreements in this case apparently did not contain express extensions for partnership, S corporation, or TEFRA-affected items.[10] This further underscores the fact that all parties mistakenly believed that they were not litigating TEFRA-covered items.

---

[10]The Form 872 agreements are not in the record, and we purposefully make no final rulings on whether the Form 872 agreements in fact contained express extensions for partnership, S corporation, or TEFRA-affected items. We simply point out that Rose and PKV seek to raise a defense that is far from frivolous.

The Tax Court nevertheless denied Rose and PKV leave to amend to raise the TEFRA statute of limitations argument, summarily stating that the proposed pleading amendments "would require further evidence" or would require the Tax Court to "offer an advisory opinion with respect to future proceedings that may be commenced as either entity-level proceedings or by affected items[,] statutory notices or computational adjustments." However, the Tax Court did not indicate what "further evidence" would be required if leave to amend were granted, nor did the Tax Court explain how it would be in the position of offering an advisory opinion. More importantly, the Tax Court did not address any of the considerations outlined by the Supreme Court in Foman, including whether the statute of limitations defense was meritorious, whether Rose and PKV engaged in undue delay or acted in bad faith, and whether prejudice would enure to the Commissioner upon amendment of the pleadings. Instead, the Tax Court simply made the conclusive statement that "[i]n view of the history of these cases, justice would not be served by expansion of the issues or reopening the record for further trial."

After review, we conclude that the Tax Court's March 7, 2006 order on the motion for leave to amend is not capable of meaningful review because the Tax Court did not address the Foman factors or the key issue of how the Commissioner's own error played a major role in the taxpayers' raising the

14

particular statute of limitations defense when they did. Cf. Danley v. Allen, 480 F.3d 1090, 1091-92 (11th Cir. 2007) (citing cases and noting that "[m]any times, and in many contexts, this Court has admonished district courts that their orders should contain sufficient explanations of their rulings so as to provide this Court with an opportunity to engage in meaningful appellate review").

This is especially so because the Commissioner implicitly acknowledges the viability of the statute of limitations defense, stating in its brief before this Court that "[t]he failure of taxpayers' prior counsel to raise a statute of limitations defense in the petitions they filed on behalf of taxpayers may give rise to a malpractice claim by taxpayers against their former attorneys." Br. of Comm'r, at 28. Moreover, as discussed, the defense, at least at this juncture, appears to be valid, because the Form 872 agreements here reportedly contained no express extensions for partnership, S corporation, or TEFRA-affected items. And although the Commissioner argues that the statute of limitations argument would require the introduction of new evidence, the Commissioner does not seem to dispute that the "new evidence" in question would be nothing more than the Form 872 agreements themselves, and even then, the Form 872 agreements would only need to be examined on their face to verify that they do not include TEFRA time extensions.[11]

_____

[11]While we again note that the Tax Court's order denying the motion for leave to amend did not specify what "further evidence" it was concerned with, we suppose that the Tax Court may have been referencing these Form 872 agreements.

15

Cf. Foman, 371 U.S. at 182, 83 S. Ct. at 230 (explaining that, among other things, a court should consider whether the party opposing amendment of the pleadings will suffer undue prejudice from amendment).

The Commissioner cites to Campbell v. Emory Clinic, 166 F.3d 1157 (11th Cir. 1999), but that case is materially distinguishable. In Campbell, we cited Foman and concluded that the district court did not abuse its discretion by denying plaintiffs leave to amend to add claims for breach of fiduciary duty, and, in fact, we noted that "[p]rejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." Campbell, 166 F.3d at 1162 & n.17. But in Campbell, we expressly noted that "[t]he facts upon which the claims for breach of fiduciary duty against the individual defendants were based were available at the time the complaints were filed." Id. at 1162. Here, all parties, including the Tax Court and the Commissioner, failed to realize that the Commissioner's own notices of deficiency erroneously made adjustments to items that ultimately were partnership-level and other TEFRA-affected items. Accordingly, while we fully acknowledge Campbell and recognize that lower courts have "extensive discretion" in determining whether or not to grant a motion for leave to amend, this case presents unique circumstances in which all parties, including the Commissioner and the Tax Court,

16

only discovered the TEFRA error after trial. Id. (quotation marks and citation omitted).

For all of the above reasons, we conclude that the Tax Court's order denying Rose's and PKV's motion for leave to amend is not capable of meaningful appellate review. Additionally, because it appears that the parties agree that issues 2, 3, and 6 are affected, either in whole or in part, by our resolution of the statute of limitations issue in favor of Rose and PKV, we will remand for further reconsideration of issues 2, 3, and 6 in light of our resolution of issue 1.[12]

## B.      Issue 4: Rose's Basis in SLPC

Rose deducted $455,151 in losses from SLPC (a subchapter S corporation) on his 1994 tax return, and $322,973 in losses from SLPC on his 1995 tax return. Rose did so by claiming increases in his basis in SLPC in 1994 and 1995 as a result of (1) Rose's 1992 and 1993 cash transfers to PKV, which was merged into TPC in January 1994, and (2) the 1994 and 1995 transactions between Rose, SLPC, and

---

[12]We note that there was some disagreement at oral argument about the extent to which resolution of the statute of limitations issue in favor of Rose and PKV would affect issue 2. There was general agreement between the parties that issue 3 (pertaining to Rose's basis in Zephyr) and issue 6 (pertaining to Rose's tax penalties) would require remand in their entirety if we resolved issue 1 in favor of Rose and PKV. However, counsel for Rose and PKV suggested that part of issue 2 (pertaining to PKV's and Rose's bases in PKVI for the 1995 tax year) would not be affected by resolution of issue 1, while counsel for the Commissioner indicated that all of issue 2 would be affected. We need not resolve this conflict. Because the parties agree that issues 2, 3, and 6 are at least substantially affected by our resolution of issue 1, we will leave it to the Tax Court to determine in the first instance the extent of the effect of the pleading amendments, if any, on those issues.

TPC, which involved $350,000 (in 1994) and $800,000 (in 1995). The Commissioner determined that Rose could not claim those basis increases in SLPC, and the Tax Court agreed. On appeal before this Court, Rose contends that the Tax Court failed to properly account for the effect of his 1992 and 1993 cash transfers to PKV in evaluating his 1994 and 1995 basis in SLPC. We agree with Rose.[13]

The parties agree that a shareholder of a subchapter S corporation (i.e., Rose in SLPC) may deduct his pro rata share of the S corporation's net operating losses, but only to the extent of: (1) the shareholder's adjusted basis in the corporation's stock; and (2) the shareholder's adjusted basis in any indebtedness of the corporation. See Selfe v. United States, 778 F.2d 769, 771 (11th Cir. 1985). A shareholder of an S corporation must make an actual "economic outlay" in order to increase his basis in the S corporation. See id. at 772 & n.7; see also Underwood v. Comm'r, 535 F.2d 309, 311 (5th Cir. 1976).[14] The actual "economic outlay"

_____

[13]Although the parties disagree as to the applicable standard of review, the Tax Court's determination that Rose could not increase his tax basis in SLPC was a mixed determination of law and fact. As such, our overall review is de novo, and our review of legal questions is de novo, but our review of findings of fact is for clear error. See Selfe v. United States, 778 F.2d 769, 774 (11th Cir. 1985) (mixed question of law and fact as to whether purported loan to corporation permits taxpayer to increase tax basis); Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1453 (11th Cir. 1989) (overall review of mixed questions is plenary, but fact findings are only reversible if clearly erroneous).

[14]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

18

must leave the taxpayer "poorer in a material sense" when the transaction is fully consummated. Underwood, 535 F.3d at 311 (quotation marks and citation omitted); see also Maloof v. Comm'r, 456 F.3d 645, 649 (6th Cir. 2006). In evaluating the question of Rose's basis in SLPC, we must consider two series of transactions: (1) the 1992 and 1993 transactions; and (2) the 1994 and 1995 transactions.

As recounted earlier, in 1992, Rose loaned PKV $990,000 in cash, and in 1993, he loaned PKV $2,863,500 in cash. In January 1994, PKV reorganized its corporate structure, resulting in two subchapter S corporations: TPC and SLPC. PKV, along with TPTC and TBPC, was merged into TPC.

As of January 1, 1994, SLPC owed TPC approximately $1.7 million, and on December 31, 1994, Rose paid $350,000 of SLPC's debt to TPC by reducing the amount that TPC owed him by $350,000. Rose did the same thing in 1995, paying $800,000 of SLPC's debt to TPC by reducing the amount TPC owed him by $800,000.

In Rose's view, in the 1994 and 1995 transactions, he assumed responsibility for debts owed by SLPC to TPC by reducing the amount of debt previously owed to him by TPC (from the 1992 and 1993 transactions) by $350,000 (in 1994) and $800,000 (in 1995), which permitted him to increase his basis in SLPC for 1994 and 1995. However, the Commissioner determined that the 1994 and 1995

19

transactions did not implicate debt actually owed to Rose, and therefore could not be used to increase Rose's basis in SLPC. Accordingly, Rose's notice of deficiency stated that Rose had an adjusted basis of only $200,000 in SLPC in 1994, and no basis in SLPC in 1995, and it allowed Rose to deduct only $200,000 of his claimed 1994 SLPC-related losses and none of his claimed 1995 SLPC-related losses.[15]

The Tax Court, however, specifically found that Rose made $990,000 in "cash transfers" to PKV in 1992, and approximately $2.8 million in "cash transfers" to PKV and its subsidiaries in 1993. Additionally, the Tax Court found that the Commissioner stipulated that in 1994, "Rose paid $350,000 of the amount which [SLPC] owed [TPC] by reducing the amount which [TPC] owed him." The Tax Court further found that the Commissioner stipulated that in 1995, "Rose paid an additional $800,000 of [SLPC's] debt to [TPC] . . . [by] reducing the amount [TPC] owed him." The Tax Court noted that the Commissioner's stipulations also acknowledged that SLPC and TPC made "journal entr[ies]" so that the transactions involving Rose were placed on their books. The Tax Court nevertheless agreed with the Commissioner that Rose's basis in SLPC was not due to be increased as a result of the 1994 and 1995 SLPC-TPC-Rose transactions. According to the Tax

_____

[15]Again, Rose claimed deductions of $455,151 (1994) and $322,973 (1995) based on these transactions.

20

Court, the 1994 and 1995 transactions "did not leave Rose poorer in a material sense" and did not constitute "an actual economic outlay" by Rose, and so Rose could not use the 1994 and 1995 transactions to increase his basis in SLPC.

The problem with the Tax Court's analysis is that it ignores its own fact findings (and arguably the Commissioner's own stipulations) about the 1992 and 1993 cash transactions between Rose and PKV (TPC's predecessor). Again, on January 1, 1994, PKV, TPTC, and TBPC were reorganized into TPC, such that as of January 1, 1994, TPC assumed any obligations owed to Rose by PKV. The Tax Court agreed with the Commissioner that the 1994 and 1995 transactions between SLPC, TPC, and Rose were "merely book entries, lacking economic substance of any sort" because "[a]t the time that [those] transactions were consummated, no party either advanced or received any funds." But the relevant "actual economic outlays" took place not in 1994 and 1995, but rather in 1992 and 1993—when Rose, as the Tax Court itself found, made "cash transfers" to PKV of $990,000 (1992) and $2.8 million (1993).

Because the Tax Court found that Rose made actual "cash transfers" to PKV—i.e., loaned it real money in 1992 and 1993—those "actual economic outlays" made Rose "poorer in a material sense" and constituted actual debt owed by PKV (and later TPC) to Rose. Those obligations, in turn, were properly shiftable between TPC and SLPC in 1994 and 1995 to increase Rose's basis in

21

SLPC.  See Selfe, 778 F.2d at 772-73 & n.7 (concluding that a shareholder in a subchapter S corporation who has guaranteed a loan to the corporation may increase her basis in the corporation when she has borrowed funds and subsequently advanced them to the corporation, and further holding that the pledge of stock to secure the loan from the bank constituted a sufficient "economic outlay," because "that pledged stock [was] not available as collateral for other investments"); see also Hitchins v. Comm'r, 103 T.C. 711, 718-19 (1994) (explaining, albeit in dicta, how if the transaction had been structured like the transactions between SLPC, TPC, and Rose, the taxpayer in Hitchins would have been able to increase his basis in the corporation that assumed sole responsibility for repayment of the debt owed the taxpayer).

In its evaluation of the 1994 and 1995 transactions between Rose, SLPC, and TPC, the Tax Court failed to adequately consider whether Rose's 1992 and 1993 "cash transfers" to PKV constituted "actual economic outlays."  While the Tax Court gave some indication in both its March 7, 2006 Second Memorandum Opinion and its March 7, 2006 order that in its view, even the 1992 and 1993 outlays by Rose could not constitute "actual economic outlays" because they were not "bona fide loans" and were instead merely capital contributions, this Court specifically stated in Ellinger v. United States, 470 F.3d 1325 (11th Cir. 2006), that a S corporation shareholder is "entitled to increase his basis in light of capital

22

contributions that he makes to the S corporation." Ellinger, 470 F.3d at 1329 n.3 (emphasis added); see also Wilson v. Comm'r, 62 T.C.M. (CCH) 1122 (1991) ("Petitioners bear the burden of proof to show that the checks they included in their tax bases for 1985 actually were contributions to capital or caused the corporations to become indebted to them in that year.") (emphasis added). Accordingly, even if—as the Commissioner argues and the Tax Court found—the Commissioner did not stipulate that Rose was owed bona fide debt by TPC, the Tax Court still failed to properly consider the effect of Rose's 1992 and 1993 "cash transfers" to PKV under Ellinger. As such, we must reverse and remand for the Tax Court to reconsider the effect of those 1992 and 1993 transfers on the 1994 and 1995 transactions and Rose's adjusted basis in SLPC.[16]

### III. CONCLUSION

---

[16]The Tax Court relied on Underwood (and similar Tax Court decisions) in support of its conclusion, but Underwood is materially different. In Underwood the taxpayers made no actual outlay with respect to the transactions in question; instead, the taxpayers simply assumed the debt of their non-profitable S corporation to their profitable C corporation, and "merely exchanged demand notes between themselves and their wholly owned corporations." See Underwood, 535 F.2d at 311-12. Likewise, in the Tax Court decisions cited by the Tax Court here, there were no actual cash outlays made by the taxpayers to the corporations (at least until years after those years for which the taxpayers were attempting to claim increased basis). See Bhatia v. Comm'r, 72 T.C.M. (CCH) 696 (1996); Wilson v. Comm'r, 62 T.C.M. (CCH) 1122 (1991); Griffith v. Comm'r, 56 T.C.M. (CCH) 220 (1989); Shebester v. Comm'r, 53 T.C.M. (CCH) 824 (1987). Indeed, in Underwood itself, the government admitted that in the year that the taxpayers actually paid the outstanding demand note on which they had assumed liability for their S corporation (which was years after the year in which the taxpayers were attempting to claim increased basis), the taxpayers could increase their basis in the S corporation (by virtue of having actually paid). Underwood, 535 F.2d at 312 n.3.

In sum, after careful review and oral argument, we conclude that the Tax Court's March 7, 2006 order refusing to permit PKV and Rose to amend their pleadings to assert their statute of limitations defense is not capable of meaningful appellate review. We further conclude that the Tax Court erred in its March 7, 2006 Second Memorandum Opinion by failing to properly account for the effect of Rose's 1992 and 1993 cash transfers to PKV on his 1994 and 1995 basis in SLPC. Accordingly, we reverse and remand the Tax Court's order of March 7, 2006, as well as the Tax Court's Second Memorandum Opinion of March 7, 2006 (published at 91 T.C.M. (CCH) 806), for further proceedings not inconsistent with this opinion as to issues 1, 2, 3, 4, and 6. We affirm as to issue 5.

**REVERSED AND REMANDED IN PART; AFFIRMED IN PART.**